UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------- x
                                            :
FORDELMA JEAN LOFTON                        :          3:13 CV 528 (JGM)
                                            :
V.                                          :
                                            :
CAROLYN COLVIN,                             :
ACTING COMMISSIONER OF SOCIAL               :
SECURITY                                    :          DATE: OCTOBER 24, 2014
                                            :
-------------------------------------------------- x
```

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE
DECISION OF THE COMMISSIONER, OR IN THE ALTERNATIVE MOTION FOR REMAND
FOR A HEARING, AND ON DEFENDANT'S MOTION FOR ORDER AFFIRMING THE
DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g)

and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of

Social Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"] and

Supplemental Security Income ["SSI"] benefits.

I.  ADMINISTRATIVE PROCEEDINGS

On July 2, 2001, plaintiff, Fordelma Jean Lofton, applied for DIB and SSI, claiming

that she was disabled due to arthritis in multiple joints, high blood pressure, diabetes,

and depression. (Certified Transcript of Administrative Proceedings, dated November 26,

2013 ["Tr."] 111-13; see also Tr. 73, 122, 406).  Plaintiff's application was denied initially

(Tr. 70-77), and upon reconsideration. (Tr. 78-83).[1] On January 7, 2002, plaintiff filed a

request for a hearing by an Administrative Law Judge ["ALJ"](Tr. 84-87), and on

December 12, 2003, a hearing was held before ALJ Ronald Thomas, at which plaintiff and

---

[1]Plaintiff previously had filed an application on May 24, 2000, alleging bilateral knee pain;
that application was denied.  (Tr. 114-17).

a medical expert, Dr. Michael G. Betten, testified. (Tr. 406; see also Tr. 90-110).[2] On July 30, 2004, ALJ Thomas issued a partially favorable decision finding that plaintiff was not entitled to DIB or SSI benefits from January 1, 2001 through September 30, 2003, but was eligible for benefits beginning on October 10, 2003. (Tr. 406-11; see also Tr. 403-05). On August 31, 2004, plaintiff requested review of the hearing decision in order to change the date that her disability began to January 1, 2001.[3]   (Tr. 419). The Appeals Council reviewed the decision (Tr. 414-15; see also Tr. 412-13) and remanded it to the ALJ to:

> Give consideration to the treating source opinions pursuant to the provisions of 20 CFR 404.1527 and 416.927 and Social Security Rulings 96-2p and 96-5p, and explain the weight given to such opinion evidence. . . .
>
> Further evaluate the claimant's mental impairment in accordance with the special technique described in 20 CFR 404.1520a and 416.920a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c) and 416.920a(c).
>
> Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and 416.945 and Social Security Ruling 85-16 and 96-8p).
>
> If warranted by the expanded record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence

---

[2]Plaintiff was represented by counsel at the administrative level and is represented on this appeal. (Tr. 39, 88-89, 422-23).

[3]Plaintiff's brief claims that she is seeking benefits beginning on January 2, 1999 (Dkt. #17, Brief at 1); however, at the hearing, plaintiff's counsel agreed that plaintiff's disability began on January 1, 2001.  (Tr. 44). Because the Court is affirming the decision of the ALJ that plaintiff's disability did not begin until October 10, 2003, it is not necessary to address these conflicting proposed onset dates.

of such jobs in the national economy (20 CFR 404.1566 and 416.966). Further, before relying on vocational expert evidence, the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and the information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

(Tr. 415). On June 1, 2007, the ALJ held a second hearing at which plaintiff and vocational expert ["VE"] Ken Smith testified. (Tr. 39-69; see also Tr. 420-21, 423A-G). On September 27, 2007, ALJ Thomas issued a second decision that again found that plaintiff did not qualify for benefits prior to October 10, 2003. (Tr. 25-35; see also Tr. 22-24). On February 14, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 2-5; see also Tr. 6-21, 36-38A).

On April 15, 2013, plaintiff filed her complaint in this pending action (Dkt. #1),[4] and on December 23, 2013, defendant filed her answer. (Dkt. #13).  On April 30, 2014, plaintiff filed her Motion to Reverse the Decision of the Commissioner, or in the Alternative, Motion for Remand for Hearing, and brief in support (Dkt. #17; see also Dkts. ##15-16), followed by defendant's Motion to Affirm the Decision of the Commissioner and brief in support, filed on June 4, 2014 (Dkt. #19),[5] and plaintiff's reply brief, filed June 25, 2014.  (Dkts. ##20-21).

For the reasons stated below, plaintiff's Motion for Order Reversing the Decision of the Commissioner, or in the Alternative, Motion for Remand for a Hearing (Dkt. #17) is

---

[4]That same day, plaintiff also filed her Motion to Proceed In Forma Pauperis (Dkt. #2), which was granted two days later.  (Dkt. #6).

[5]On June 6, 2014, the administrative record, dated November 26, 2013, was filed.  (Dkt. #23).  On October 15, 2014, defendant filed a single page that had been erroneously omitted from the original administrative record.  (Dkt. #22).

denied, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #19) is granted.

## II. FACTUAL BACKGROUND

### A. HEARING TESTIMONY AND ACTIVITIES OF DAILY LIVING

Plaintiff was born in 1953 (Tr. 111, 340), and thus is sixty-one years old. She has never been married (id.), and she lives with her adult son. (Tr. 42). She has a high school education (Tr. 44, 50), and has received training for administrative work and basic computer skills. (Tr. 44, 342).  Plaintiff was laid off from her position as an assembly worker in 1999 after having held the job for three years.  (Tr. 343-44).  Plaintiff claims that she injured her knees in a fall in 1997 (Tr. 357-58), after which her employment was terminated because of the amount of work she missed due to her medical problems related to this fall.  (Tr. 344-46).  Plaintiff continued to work in temporary employment positions until 2001, including performing data entry at Excel Personnel and working as a bread feeder at Pepperidge Farm.  (Tr. 44-45).  Plaintiff testified that she was never required to lift anything heavier than ten pounds while working as an electronics assembler or data entry clerk.  (Tr. 59).  However, she was unable to keep her job as a bread feeder because she had to lift roughly twelve pounds.  (Id.).

During the years in question, plaintiff claimed that she had difficulty sleeping due to her pain and required medication to help her fall asleep.  (Tr. 135).  While she did not report any need for special help with washing, shaving, bathing, dressing, etc., she did note that she had some difficulties getting in and out of the tub while bathing and that she needed to allot at least an hour of time to get dressed.  (Id.; see also Tr. 177).  She had difficulties shopping and normally had someone else do so for her.  (Tr. 137, 190).

She was able to prepare daily meals such as salads, and baked chicken and fish with the help of her son but was unable to perform any household chores.  (Tr. 136).  She reported being unable to do laundry or cleaning (id.), but also claimed that she would still try to do these activities on occasion.  (Tr. 190).  Her son helps her with most of her activities of daily living.  (Tr. 136, 190).  She would leave her house to attend church meetings or doctor's appointments and was able to go out alone; however, she did not have a driver's license and relied upon other people for rides.  (Tr. 137, 139, 190). Due to her diabetes, plaintiff would also monitor her blood sugar and record the results in a log book twice a day.  (Tr. 190).  She reported only being able to walk for two blocks before having to stop and rest.  (Tr. 141).  She was still able to pay bills, count change, handle a savings account, and use a checkbook.  (Tr. 138).

Plaintiff testified that in 2001 she had surgery on her eyes to repair her cataracts. (Tr. 46).  She claimed that before the surgery she suffered from headaches caused by her poor vision (Tr. 56) and that she did not see well; however, the surgery improved her vision.  (Tr. 47).  Plaintiff is diabetic and stated that in 2001 her diabetes was "out of control."  (Id.).  Plaintiff testified that in 2001 she had numbness in her hands and feet, was taking multiple medications, and wore a brace on her knee and arm.  (Tr. 47-48). Other than the cataract surgery, plaintiff was not hospitalized between 2001 and 2003. (Tr. 48).  Plaintiff claimed that she had torn ligaments in her knees due to a fall and that she received treatment from a chiropractor.  (Tr. 54-55).  Plaintiff testified that in 2001, her knees would "give way[]," that she experienced pain in her knees and legs, that she was unable to lift things, and that she was unable to sit for a long length of time.  (Tr. 48).  She claimed that she had diabetic neuropathy and carpal tunnel syndrome which

5

caused numbness in her hands, pain in her arms, and difficulty picking up, holding, and grasping objects.  (Tr. 52-53).  She testified that these issues were more severe between 2001 and 2003 because she was not yet receiving treatment.  (Tr. 53).  At the time of the hearing, plaintiff explained that she had never had wrist surgery because she was told that it "didn't do anything. It didn't really help."  (Tr. 67).  She also claimed that she had pain and numbness in her knees and feet caused by her diabetic neuropathy which would cause her to fall down if she attempted to walk for a long distance.  (Id.).   Plaintiff claimed that her feet and hands would swell often and that, in accordance with her doctor's instructions, she would elevate her feet to relieve the swelling.   (Tr. 54).  However, she was unable to elevate her feet while working.  (Tr. 57).

Plaintiff also testified that she experienced depression between 2001 and 2003 that required medication and monthly doctor visits but never resulted in an overnight stay in a hospital.  (Tr. 49).  She claimed that the depression resulted in constant exhaustion (Tr. 57) and caused her to lose motivation to perform any activities, and that she regularly had days when she would not get out of bed.  (Tr. 55-56).  Plaintiff claimed that while she used to enjoy activities such as bowling and going to the movies, her only activities during the relevant time were attending Bible study meetings and being taken out "to get food or something like that."  (Tr. 49).   She also testified that she had problems focusing which she believed were due to her medication.  (Tr. 50-51).

The VE at plaintiff's hearing testified that an individual with plaintiff's age, education, and past relevant work experience who is unable to maintain a competitive pace due to physical and mental complaints could not perform plaintiff's past relevant work and could perform no positions in the local or national economies.  (Tr. 61).  He also

testified that an individual with plaintiff's age, education, and past relevant work experience who is limited to performing sedentary work as defined in the regulations and has the further limitations of the need for simple, routine, repetitive work with one or two step instructions, and a supervised job requiring few decisions, could not perform any of plaintiff's past relevant work but could perform work as an assembler, inspector, and general production laborer at the sedentary level.  (Tr. 61-62).  The VE testified that there were approximately 1,100 jobs in Connecticut and 87,000 jobs in the country as an assembler, 400 to 500 jobs in Connecticut and 54,000 jobs in the country as a sedentary level general production laborer, and approximately 200 to 300 jobs in Connecticut and 13,000 jobs in the country as an inspector.  (Tr. 62).  The VE opined that his testimony did not conflict with the <u>Dictionary of Occupational Titles</u>.  (<u>Id.</u>).  He clarified that the hypothetical upon which he was basing these conclusions did not include a restriction in the use of one's hands, and if there was a further limitation that the claimant had carpal tunnel syndrome and could not use her hands to do repetitive work for longer than fifteen minutes then the individual would not be able to work as an assembler, as a sedentary level general production laborer, or as an inspector.  (Tr. 66).  However, the hypothetical person would be able to work as a surveillance system monitor (<u>id.</u>), of which there are approximately 100 jobs in Connecticut (<u>id.</u>) and 4,000 to 5,000 jobs in the country.  (Tr. 66, 68). If a further restriction was added so that the hypothetical person also had impaired vision, then the surveillance system monitor job would also be precluded.  (Tr. 67).

B. MEDICAL RECORDS

Prior to the alleged onset date, on June 23, 1997, plaintiff tripped and sustained an extension-rotation injury to her right knee, a severe contusion on her face, and two loosened teeth. (Tr. 256; see also Tr. 221, 336-77). After this incident, Dr. Evan Rashkoff of Northwest Orthopedic Associates noted that plaintiff was "working but very uncomfortable[]" and that she was wearing the knee brace that the hospital had provided after her fall. (Tr. 256). He recommended that she modify her activities, take Ibuprofen, and if physical therapy did not resolve her issues after three weeks, "consideration should be given to either a diagnostic arthroscopy or an MRI scan." (Id.).

Between 1999 and 2003, plaintiff received most of the treatment for her continuing knee problems and other issues at the Norwalk Community Health Center. (See Tr. 208, 210-16, 219-21, 229, 257, 280-96, 302, 386-88). On September 29, 1999, plaintiff's knees were evaluated and it was noted that she had been receiving physical therapy treatments with a chiropractor, had episodes of joint effusion with joint pain mostly in the right knee after prolonged knee bending or standing, and had four incidents of her knees giving out. (Tr. 221). On October 5, 1999, an MRI was performed on plaintiff's right knee which found the knee demonstrated Grade I medial and lateral chondromalacia patella. (Tr. 224; see also Tr. 220, 225). Plaintiff missed a consultation to discuss orthopedic surgery for her knees on October 20, 1999 (Tr. 229), and did not show up for appointments with Dr. J.M. McReynolds on November 3 and December 8, 1999. (Tr. 220).  On May 5, 2000, plaintiff's right knee showed minor swelling that would become worse after long periods of standing and walking. (Tr. 219). Plaintiff was given a prescription for Tylenol, and was told to consider a knee brace and to continue her

physical therapy. (Id.).  Plaintiff's knees were x-rayed on May 25, 2000, and the results were normal with the exception of "the presence of a small calcification noted within Hoffa's fat pad of the left knee of uncertain significance."  (Tr. 222).  Plaintiff missed another appointment on August 10, 2000.  (Tr. 216).

In early 2001, plaintiff was seen for hand and arm numbness; during that visit, it was noted that plaintiff was taking pain medicine to combat knee pains and had cataracts. (Id.).  On April 6, 2001, plaintiff reported resolution of the numbness in her arms and hands but was found to have high glucose levels.  (Tr. 215).  Around this time, plaintiff was diagnosed with type II diabetes, for which she began taking Metformin.  (Tr. 214; see also Tr. 281).  On May 24, 2001, plaintiff was seen for a follow up appointment for her diabetes where she reported limited side effects from her diabetes medication and no other complaints.  (Tr. 213).  Plaintiff missed another appointment with Dr. McReynolds on June 6, 2001.  (Id.).  On June 14, 2001, plaintiff reported vomiting in the morning, but she would feel better after lying down for awhile.  (Tr. 212). On July 19, 2001, plaintiff was seen for a follow up appointment for her diabetes as well as to address her complaints of joint pain in her hands, legs, and knees.  (Id.). Her knee pain was associated with prolonged standing and required her to sleep with a pillow to support her knees to avoid discomfort.  (Tr. 211).  After examining plaintiff, Dr. McReynolds noted that her hands, lower extremities, and knees all had a good range of motion but that plaintiff's first finger on her right hand was mildly tender and her Achilles tendon had mild pain.  (Id.).  On September 10, 2001, plaintiff was seen for another follow up appointment regarding her diabetes and continued to report pain in her right fingers, knees, and left calf Achilles tendon; during the exam, her doctor found tenderness in one

of her fingers on her right hand and in her knees.   (Tr. 210).   On October 3, 2001, plaintiff received further education about diabetes and agreed to begin walking in her neighborhood in order to lose weight.  (Tr. 281).   On November 8, 2001, plaintiff had a follow up appointment to address both her diabetes and continuing issues with hand, joint, and back pain.  (Tr. 285-86).   On November 20, 2001, plaintiff underwent an EMG which showed carpal tunnel syndrome in her right wrist but normal nerve conduction in her lower extremities.   (Tr. 261).   A month later, on December 20, 2001, plaintiff was seen in the orthopedic clinic and prescribed Neurontin for chronic pain.  (Tr. 286-87).   On December 21, 2001, plaintiff underwent eye surgery to repair her cataracts in her right eye.  (Tr. 263-64; see also Tr. 254, 265-78).

On January 22, 2002, plaintiff underwent x-rays that revealed normal wrists and feet.  (Tr. 298).   On February 21, 2002, plaintiff continued to complain of pain in her feet and hands and was wearing wrist splints.  (Tr. 288).   On March 7, 2002, plaintiff was seen by a hand surgeon, who prescribed "PM splints" and Celebrex.  (Tr. 290).   On July 18, 2002, plaintiff underwent imaging of her knees which showed "[m]ild joint space narrowing of both medial compartments of the knees, consistent with mild osteoarthritis." (Tr. 279).   On August 26, 2002, plaintiff was seen for a follow up appointment for her existing conditions and with the new complaint of a toothache.  (Tr. 292-93).   She was not seen again for another ten months until June 12, 2003, when plaintiff complained of bilateral foot pain that became worse when she walked.  (Tr. 294).   On July 1, 2003, plaintiff was referred to a podiatrist because of the pain in her feet.  (Tr. 295-96).   On August 27, 2003, plaintiff underwent a heart stress test which yielded normal results.  (Tr. 325).   On September 11, 2003, plaintiff underwent a breast biopsy which found no

evidence of a malignant growth.  (Tr. 334; see also Tr. 332-33, 335, 386-88, 391-92, 394-95, 402).

Plaintiff was also seen in the rheumatology clinic of Norwalk Hospital six times between November 2001 and November 2002. (Tr. 303-05, 308). During a visit on January 17, 2002, the doctor noted that plaintiff suffered from pain in her legs and feet for the past three to four years, mild carpal tunnel syndrome in her right wrist, and diabetes, which fluctuates and was "better when she exercises."  (Tr. 304).  During the April 25, 2002 visit, plaintiff was wearing wrist splints which provided "some relief" and it was noted that she had been referred to Dr. Haik Kavookjiam, an orthopedic surgeon, who "advised surgery for her [carpal tunnel syndrome]." (Tr. 305). She was seen six times by the Metabolic and Endocrinology Department of Norwalk Hospital between May 2002 and June 2003.  (Tr. 306-07, 309-12).  On May 22, 2002, it was noted that plaintiff had recently started walking forty-five minutes every day. (Tr. 306).

In January 2002, plaintiff reported that subsequent to her original filing, she had eye surgery in her right eye, was planning to have surgery in her left eye, and was taking the new medications of Neurontin and Monopril for the nerve pain in her legs and high blood pressure, respectively. (Tr. 153).

In 2011, plaintiff underwent a panretinal photocoagulation procedure for her left eye.  (Tr. 7-15).  On February 14, 2012, plaintiff underwent a carpal tunnel release procedure for her right hand due to her "chronic progressive severe carpal tunnel syndrome in combination with diabetes." (Tr. 16-17).  On March 6, 2012 plaintiff also underwent a right tennis elbow release with partial lateral epicondylectomy and repair/

11

reattachment of extensor tendon due to "chronic progressive right lateral elbow pain, which has been present for [two] years[.]"  (Tr. 18-19).

C. DISABILITY DETERMINATION RECORDS

Plaintiff originally applied for benefits on May 24, 2000 (Tr. 114-16) but was denied on August 21, 2000.  (Tr. 117).  When evaluating this application for the Connecticut Disability Determination Services ["DDS"], on August 10, 2000, Dr. Vidya Raman found plaintiff to have complete muscle power in all four extremities and a full range of motion in her shoulders, elbows, wrists, hips, knees, and ankles.  (Tr. 164-65). Dr. Raman commented that the MRI and x-ray tests of her knees did not reveal any abnormalities and that she suspected that plaintiff "does not have enough objective findings to go with her complaints."  (Tr. 165).

Plaintiff completed a disability report on June 29, 2001 (Tr. 121-30), in which she listed her illnesses as "(arthritic) knees, hands, wrist, bad back, high blood pressure, diabetes, brittle bone problems, [and] depression."  (Tr. 122).  She claimed that these afflictions limited her ability to work because she could not "stand, sit, or have complete use of her hand" and that she had "lost [her] job because of missing time from work to go to [the] doctor and [being] out sick[.]"  (Id.).  She claimed that while working as an electronic parts assembler from 1996 to 1999 that she had to: walk one hour a day; stand two hours a day; sit six hours a day; handle, grab, or grasp big objects half an hour a day; write, type, or handle small objects half an hour a day; and frequently lift twenty-five pounds.  (Tr. 123).[6] On July 9, 2001, plaintiff provided a more detailed listing of her conditions (Tr. 131-42), explaining that the pain from her knees extended down her legs

_____

[6]However, plaintiff also states in the same form that the heaviest weight lifted on the job was twenty pounds. (Id.).

into her feet and could result in numb toes.  (Tr. 131).  She also explained that she suffered from vomiting and diarrhea, and that she had trouble sleeping at night and concentrating during the day because of her pain.  (Id.).  Plaintiff claimed that she constantly had these symptoms and that the pain that they caused was severe.  (Tr. 132). She was taking Ibuprofen, Glucophage, Acetaminophen, Trazodone, and Estrogen to treat her symptoms.  (Id.).  She claimed that the medications were responsible for her gastrointestinal problems and that they also caused hot flashes.  (Tr. 133).

On June 14, 2001, plaintiff's treating physician, Dr. McReynolds, completed an assessment of plaintiff's physical abilities to do work-related activities.  (Tr. 258-59).[7]  He found that because of plaintiff's torn ligaments in her knees as well as her high blood pressure and diabetes, that she was not able to lift any significant weight, either frequently or occasionally, that she could not walk at all during an eight hour workday, and that she could sit for two hours in a normal eight hour workday or one hour without interruption.  (Tr. 258).  He stated that because of plaintiff's "mild chondromalacia" in her right knee, plaintiff could never climb, crouch, kneel, or crawl, but she could frequently balance and occasionally stoop. (Tr. 259).  He found that plaintiff's ability to push and pull was affected by her condition and that she could not be around heights or vibrations. (Id.).  He stated that no medical findings supported his assessment that plaintiff needed to avoid heights and vibrations at the time of the report but that there was a "work up initiated."  (Id.).

On July 10, 2001, Social Worker Jeffrey A. Tauscher and APRN Holly Goss completed a form regarding plaintiff's level of functioning.  (Tr. 169-71).  They noted that

_____

[7]See note 14 infra.

Tauscher had only begun to see plaintiff on June 13, 2001 and that she had failed to show up for her second visit.  (Tr. 169).  They diagnosed plaintiff with dysthymic disorder, a form of depression, for which plaintiff was taking Trazadone, as prescribed by APRN Goss.  (Id.).  They further noted that plaintiff had been assaulted in an attempted rape in either 1985 or 1986, that she had been beaten and had both of her arms broken in a street attack in 1990, and that she had been at Norwalk Hospital Inpatient Psychiatric and Hall-Brooke Hospital in either 1989 or 1990.  (Id.).  They added that plaintiff lives independently and is active in her church.  (Tr. 170).

On July 5, 2001, APRN Goss completed a psychiatric assessment of plaintiff.  (Tr. 172-76).  As in the previous report, she also mentioned plaintiff's history of being violently attacked and her hospitalization in 1989 or 1990.  (Tr. 172-74).  She ultimately diagnosed plaintiff as having dysthymic disorder and assigned her a Global Assessment of Functioning score of 60.  (Tr. 176).

On September 7, 2001, plaintiff was evaluated by Dr. Rakesh Anand for DDS. (Tr. 177-78). He found that plaintiff had pain in her lower back and knees, that her diabetes was under control, that she wore a brace on her right knee and a wrap over her right ankle (Tr. 177), and that she walked with a cane with minimal limping.  (Tr. 178).  Despite these impairments, he noted that she was able to eat by herself, groom herself, and perform non-strenuous activities such as sitting, standing, and walking.  (Tr. 177).  He found that she had normal grip strength in her upper extremities and a full range of motion in both her upper and lower extremities.  (Tr. 178).

A Residual Functional Capacity ["RFC"] assessment of plaintiff was completed on September 13, 2001 by Dr. Arthur Waldman for SSA. (Tr. 179-87).   Dr. Waldman

observed that plaintiff wore a brace on her right knee and an Ace bandage on her left ankle, and used a cane despite having a minimal limp.  (Tr. 187).  He noted that her upper and lower extremities were normal, as were her neurological functions.  (Id.).  Dr. Waldman found that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for about six hours in an eight hour workday, sit for about six hours in an eight hour workday, and had no limits in her ability to push and/or pull.  (Tr. 180).  Plaintiff could also occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl, but she could never climb ladders, ropes, or scaffolds.  (Tr. 181).  The RFC assessment found plaintiff had no visual, manipulative, communicative, or environmental limitations.  (Tr. 182-83). Dr. Waldman opined that plaintiff was not entirely credible in her allegations and that her diabetes and hypertension were under control. (Tr. 184).

On September 14, 2001, plaintiff underwent an initial level consultative psychological examination by Frank Volle, Ph.D for DDS (Tr. 188-91), who found plaintiff to be intellectually and emotionally capable of handling routine repetitive tasks, satisfactorily able to understand, carry out, and remember instructions, and satisfactorily able to respond appropriately to supervision, coworkers, and work pressures in a work setting. (Tr. 191).  However, Dr. Volle noted that if plaintiff's alleged medical problems were accurate, potential employment could be difficult for her.  (Id.).  The examiner diagnosed plaintiff with cocaine abuse which had been in remission for eleven years and intermittent adjustment reaction with anxious mood.  (Id.).

On October 2, 2001, a Psychiatric Review Technique of plaintiff was completed by Robert Deutsch, Ph.D for SSA (Tr. 192-206), who found that plaintiff's mental

impairments were not severe.  (Tr. 192).  Dr. Deutsch indicated that plaintiff had an adjustment disorder, but it did not satisfy Listing 12.04 for Affective Disorders.  (Tr. 195). He found that this disorder caused mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation of extended duration. (Tr. 202).

After being denied benefits on October 2, 2001 (Tr. 70), plaintiff provided a Reconsideration Disability Report ten days later.  (Tr. 146-49).  She claimed that the increase in medication was to treat her increased depression and to help her sleep despite suffering from pain.  (Tr. 146).  Plaintiff claimed that since her filing in July, her "back is a bigger problem now" and that she was no longer able to lift, climb stairs, or stand or sit for too long.  (Tr. 146).  She also claimed that her "arms were broken" and that her arms had "problems now." (Id.)

A second Psychiatric Review Technique of plaintiff was completed on December 13, 2001 by Robert Sutton, Ph.D (Tr. 230-44), who analyzed plaintiff under Listing 12.04 for her adjustment disorder and under 12.09 for her history of cocaine abuse. (Tr. 230; see also Tr. 234). Dr. Sutton found that plaintiff's conditions resulted in no restrictions of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (Tr. 241).  Dr. Sutton also completed an Adult Mental Impairment Summary Form that same day in which he found that plaintiff's adjustment disorder was not severe.  (Tr. 232).

On December 27, 2001, plaintiff's second RFC assessment was completed by Dr. Bilqis Khan (Tr. 245-52), who considered plaintiff's claim under a primary diagnosis of

16

knee pain, a secondary diagnosis of back pain, and the other alleged impairments of diabetes and depression.   (Tr. 245).   His results were similar to the original RFC assessment in finding that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for a total of about six hours in an eight hour workday, sit for about six hours in an eight hour workday, and that she had no limits in her ability to push and/or pull.  (Tr. 246).  He noted that plaintiff used a cane but appeared to have minimal difficulty walking.  (Id.).  He also found that plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl, but that she could never climb ladders, ropes, or scaffolds.  (Tr. 247). Dr. Khan found that plaintiff had no visual, manipulative, communicative, or environmental limitations.  (Tr. 248-49).  Like in the original RFC, he had no treating or examining source statements in plaintiff's file regarding her physical capacities.  (Tr. 252).

The Vocational Analysis Summary Form completed on December 27, 2001 found that plaintiff could perform work at a light level and that she was not disabled because she could return to her previous employment as a data entry clerk. (Tr. 253).

### III. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.  Second, the court must decide whether the determination is supported by substantial evidence.   See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel,

145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  See id.  Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See 42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process. See 20 C.F.R. §§ 404.1520, 416.920.  First, the ALJ must determine whether the claimant is currently working.  See 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is currently employed, the claim is denied.  Id.  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.  See 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is

to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work.  See 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

## IV. DISCUSSION

Following this five step process, ALJ Thomas concluded that plaintiff was not under a disability from January 2, 1999 through October 10, 2003, but that she has been under a disability subsequent to October 10, 2003.  (Tr. 26).  He began by finding that plaintiff has not engaged in substantial gainful employment since January 2, 1999, the alleged onset date.  (Tr. 28, citing 20 C.F.R. §§ 404.1520(b), 404.1571 et seq., 416.920(b), 416.971 et seq.).  ALJ Thomas then concluded that the medical evidence supports a finding that the claimant had the following severe impairments: diabetes mellitus with

neuropathy, bilateral degenerative joint disease of the knees, and depression.  (Id., citing 20 C.F.R. §§ 404.1520(c), 416.920(c)).   However, in the third step of the evaluation process, ALJ Thomas concluded that plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I for the period of time in question.  (Tr. 28-29, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926).  In addition, at step four, the ALJ found  that plaintiff had the RFC to perform "sedentary exertional level work" which would involve "lifting no more than ten pounds at a time and occasional lifting or carrying of articles like docket files, ledgers, and small tools."  (Tr. 30, 33, citing 20 C.F.R. §§ 404.1545, 416.945).  ALJ Thomas included the additional restriction that plaintiff was only able to perform "cognitive simple, routine, and repetitive work with one or two step instructions and was limited to a supervised, low stress environment defined as one requiring few decisions."  (Tr. 30).  Finally, ALJ Thomas concluded that plaintiff was unable to perform any of her past relevant work, but given her age, education, work experience, and RFC, there were jobs in the national economy that she could have performed during the relevant time.  (Tr. 33-36, citing, inter alia, §§ 404.1560(c), 404.1565, 404.1566, 416.960(c), 416.985, 416.966).

Plaintiff seeks an order reversing or remanding the decision of the Commissioner. (Dkt. #17).  Plaintiff alleges that the ALJ made seventeen errors in his decision (Dkt. #17, Brief at 3-4) but has organized these allegations of error under seven headings. (Id. at 10-28).  Plaintiff claims that the ALJ erred because: in the evaluation of the evidence, he committed a number of factual errors as well as misstatements, distortions, and mischaracterizations of the evidence (id. at 10-14); the ALJ failed to properly follow the

20

treating physician rule (id. at 14-18); the ALJ failed to find that some of plaintiff's illnesses and ailments are severe and failed to evaluate all of her illnesses and ailments singly and in combination (id. at 18-21); plaintiff had listed impairments between 1999 and 2003 (id. at 21-23); the ALJ failed to properly determine plaintiff's RFC (id. at 23-24); defendant has failed to meet her burden of proof (id. at 24-27); and the ALJ failed to follow the order from the Appeals Council (id. at 27-28).

Defendant counters that plaintiff has failed to establish that she meets or equals the severity of any listing (Dkt. #19, Brief at 5-7); the ALJ's RFC determination is supported by substantial evidence and is legally correct (id. at 7-10); plaintiff has failed to establish that her miscellaneous allegations of error justify remand (id. at 10-13); the ALJ's decision comports with the treating physician rule (id. at 13-16); the ALJ properly considered plaintiff's impairments singly and in combination (id. at 16-19); the ALJ properly found that plaintiff could perform other work that existed in significant numbers in the national economy (id. at 19-20); and the ALJ followed the Appeals Council's remand order (id. at 20-21).

A. THE ALJ'S EVALUATION OF THE EVIDENCE

Plaintiff argues that the ALJ erred by not mentioning all of her ailments, the pain caused by these ailments, and the resulting need for her to use a cane and wrist braces. (Dkt. #17, Brief at 12-14).  First, plaintiff claims that the ALJ failed to identify all of plaintiff's disabling ailments, specifically her carpal tunnel syndrome, osteoarthritis of the knees, and torn bilateral knee ligaments.  (Id. at 12).  Plaintiff also argues that the ALJ failed to mention her back and knee pain.  (Id. at 13). Finally, plaintiff contends that the ALJ erred by not taking into account her use of a cane and wrist splints when determining

her RFC and whether work existed that she could perform.   (Id.).   Some of plaintiff's claims regarding the ALJ's evaluation of the evidence rely on allegations that are not supported by the record. The Court will address these issues first before moving on to plaintiff's remaining arguments.

### 1. MISSTATEMENTS OF THE RECORD

Plaintiff claims that the ALJ did not consider her osteoarthritis of the knees (id. at 12); however, osteoarthritis is synonymous with degenerative joint disease (see National Institute of Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001460/ (last visited 8/11/14)), a condition which the ALJ found to be a severe impairment.   (Tr. 28).   Similarly, plaintiff argues that the ALJ did not mention either her "bilateral knee pain with standing and walking" or her "medial and lateral Chondromalacia Patella." (Dkt. #17, Brief at 13).   These claims are repetitive since medial and lateral Chonomalacia Patella is also known as anterior knee pain (see National Institute of Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001488/ (last visited 8/11/14)), and, contrary to plaintiff's claims, the ALJ found that plaintiff suffered from bilateral knee pain when he found that her degenerative joint disease, or osteoarthritis, was severe.   (Tr. 28).

Plaintiff contends that the ALJ erred by not mentioning her ACL instability and torn knee ligaments.   (Dkt. #17, Brief at 12-13).   While plaintiff posits that she developed ACL instability after a fall in 1997 (id. at 13, citing Tr. 221), the record only shows that on September 29, 1999 plaintiff's symptoms were "suggestive of ACL instability[,]" not that it was ever formally diagnosed.   (Tr. 221).   Rather, when an MRI of plaintiff's right knee was taken on October 3, 1999, her ACL, as well as her medial and lateral menisci, the

posterior cruciate ligament, and the medial and lateral collateral ligaments, were all "intact." (Tr. 224).  Three years later, on November 21, 2002, an examination of plaintiff revealed that her knees were tender but that there was no instability.  (Tr. 310).

Plaintiff also argues that the ALJ did not consider her torn knee ligaments.  (Dkt. #17, Brief at 12, citing Tr. 166).  While plaintiff may have suffered from torn knee ligaments in the past (Tr. 166), the October 3, 1999 MRI shows that as of that date, plaintiff's knee ligaments were "intact."  (Tr. 224).

Finally, plaintiff claims that the ALJ did not address her carpal tunnel syndrome and the bone abnormalities in her wrists (Dkt. #17, Brief at 12-13); however, the ALJ discussed plaintiff's carpal tunnel syndrome and found it to be a medically determinable impairment that was not severe.  (Tr. 28).  He noted that "medical records from treating sources in January 2002 found no evidence of any abnormalities of the wrists."  (Tr. 34-35; see also Tr. 298).   Furthermore, plaintiff incorrectly claims that "[r]adiographic evidence [of the wrists] showed intrinsic bone abnormality[,]" while the report cited actually states that there was "no radiographic evidence of intrinsic bone abnormality."  (Compare Dkt. #17, Brief at 13 with Tr. 298)(emphasis added).

Therefore, plaintiff is incorrect in her claims that the ALJ did not address her osteoarthritis, her grade 1 medial and lateral chondromalacia patella, her bilateral knee pain, and her carpal tunnel syndrome.   The ALJ also did not err by not addressing plaintiff's ACL instability, torn knee ligaments, and the evidence of bone abnormalities in her wrists because these conditions were not diagnosed during the relevant time.

## 2. PLAINTIFF'S ADDITIONAL KNEE IMPAIRMENTS AND BACK PAIN

Plaintiff alleges that the ALJ failed to include evidence of all of her knee impairments and back pain. (Dkt. #17, Brief at 12-13).

"Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted. An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." Brault v. Soc. Sec. Admin., 683 F.3d 443, 448 (2d Cir. 2012), citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)(internal quotations omitted).[8]

Plaintiff claims that the ALJ erred by not mentioning her joint effusion, or swelling, in both knees. (Dkt. #17, Brief at 13).  However, on September 29, 1999, while it was noted that in the past plaintiff "had episodes of joint effusion," none was found in her knees on that day.  (Tr. 221).  And while Dr. McReynolds noted "mild swelling" in plaintiff's right knee on May 5, 2000 (Tr. 219), on July 19, 2001 plaintiff "denie[d] any obviously swollen joints[]" (Tr. 212), and on September 10, 2001, Dr. McReynolds noted that there was no swelling in plaintiff's lower extremities.  (Tr. 211).  Similarly, while being examined in the Rheumatology Clinic on November 11, 2002, plaintiff was found to have no joint effusion.  (Tr. 310).

Plaintiff also asserts that the ALJ erred by failing to discuss her back pain.  (Dkt. #17, Brief at 13).  However, the ALJ relied upon the opinion of Dr. Waldman, a non-examining physician (Tr. 33), who considered plaintiff's back pain before ultimately

---

[8]Plaintiff provides ample case precedent to support that a case may be remanded when an ALJ commits factual errors or states findings which are inconsistent with the record (Dkt. #17, Brief at 10-12); however, plaintiff alleges that the ALJ failed to include evidence of all of plaintiff's knee impairments and back pain, not that he committed a factual error or misstated any evidence concerning these impairments.  (Id. at 12-13).

deciding that she was capable of performing light exertional level work.  (Tr. 180-81, 187).[9]  Also, between September 29, 1999 and August 13, 2003, plaintiff's medical progress notes show that she was consistently treated for her diabetes, pain in her knees, and issues with her hands and feet (Tr. 210-21, 285-313); however, there are very few references to plaintiff experiencing pain in her back.  (Tr. 285).  Similarly, while objective tests were performed on plaintiff's knees (Tr. 217, 222, 224, 292) and feet and wrists (Tr. 261, 298), the record contains no tests which were aimed at diagnosing plaintiff's back pain.  Finally, while the ALJ did not specifically mention plaintiff's back pain, he did state that he considered all of plaintiff's pain symptoms before finding that her allegations of pain did not correlate to the objective medical evidence and that she was not fully credible.  (Tr. 31).  Therefore, the ALJ did not err by not specifically mentioning plaintiff's joint effusion or back pain in his decision.

### 3. PLAINTIFF'S USE OF A CANE AND WRIST SPLINTS

Plaintiff posits that the ALJ erred when determining her RFC and when questioning the VE because he did not consider her use of a "prescribed cane to ambulate and to prevent falls[]" and bilateral wrist splints. (Dkt. #17, Brief at 13).  Plaintiff claims that the use of these devices significantly eroded her occupational base.  (Id.; see also Dkt. #20, at 8).

"[T]he occupational base for an individual who must use [a medically required hand-held device] for balance because of significant involvement of the lower extremities. . . may be significantly eroded."  Social Security Ruling ["SSR"] 96-9p, 1996 WL 374185, at *7 (S.S.A. July 2, 1996).  "To find that a hand-held assistive device is medically

---

[9]In addition, the ALJ considered plaintiff's back pain in his original decision when determining that plaintiff could perform sedentary level work.  (Tr. 407).

required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed[.]"   Id.   "[I]f a medically required hand-held device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded."   Id.

Plaintiff has provided no evidence to show that her cane was medically required. Plaintiff cites to an examination performed on September 7, 2001 by Dr. Anand (Dkt. #17, Brief at 13), in which he noted that plaintiff has started "to use a cane to help with her balance[,]" and "because of problem[s] with her knee joints."  (Tr. 177).   In that same report, Dr. Anand noted that "[o]n a day-to-day basis . . . she can do nonstrenuous physical activities of sitting, standing, and walking, however, she was carrying a cane today." (Id.).   Plaintiff also points out that Dr. Volle found that even with the use of a cane, plaintiff's "gait is rather slow and somewhat limping." (Dkt. #17, Brief at 13; Tr. 188). However, Drs. Waldman and Khan both acknowledged plaintiff's use of a cane but described her limping as "minimal[.]"  (Tr. 181, 246).   Dr. Khan chose not to mark a box indicating that plaintiff "medically required a hand-held device for ambulation[,]" and instead noted next to this box that plaintiff "uses [a] cane on her own."  (Tr. 246).   Even more telling is that in May 2002, plaintiff's medical records, without mentioning the use of or need for a cane, indicate that she was able to walk for forty-five minutes a day in order to help combat her diabetes.   (Tr. 306).[10]   Also, in 2001, Dr. McReynolds noted that

---

[10]A Diabetes Education Report from October 3, 2001 mentions that plaintiff walks for thirty minutes a day.  (Tr. 281).  However, this report still makes no mention of the need for plaintiff to use a cane for these walks and further suggests that plaintiff "incorporate walking in [her] neighborhood to help [with weight] loss [and blood glucose] contr[ol]" without mentioning a need to walk with a cane. (Id.).

plaintiff had "[zero] gait disturbance[.]"  (Tr. 216).  Plaintiff has failed to show that her use of a cane was medically required or that it significantly eroded the occupational base; therefore, the ALJ did not err by not specifically mentioning it.[11]

Plaintiff also argues that the ALJ erred by not directly addressing plaintiff's wrist splints and carpal tunnel syndrome.  (Dkt. #17, Brief at 12-13).  However, as previously mentioned, the ALJ found plaintiff's carpal tunnel syndrome to be a medically determinable, but non-severe, impairment and specifically mentioned the testimony of the VE that plaintiff would be unable to perform any jobs if she could not perform repetitive tasks due to carpal tunnel syndrome.  (Tr. 34-35).  Plaintiff claims that the ALJ incorrectly discounted plaintiff's carpal tunnel syndrome because "Carpal Tunnel Syndrome is diagnosed with a series of tests, including physical examination and nerve conduction testing" and that "[l]aboratory and X-ray testing cannot diagnose Carpal Tunnel Syndrome[.]"  (Dkt. #20, at 7).  However, plaintiff's nerve conduction study showed only "a mild, right median nerve demyelinating neuropathy across the wrist/i.e. carpal tunnel syndrome[]."  (Tr. 261).  There was no mention of any impairments in the left wrist.[12] These results are consistent with the ALJ determining that plaintiff suffered from carpal tunnel syndrome but not finding it to be a severe impairment.  (Tr. 28).  Plaintiff cites to

---

[11]Plaintiff also claims that her cane was "prescribed."  (Dkt. #17, Brief at 13, 24). However, the document to which plaintiff cites in support for this fact mentions that "[s]he has started to use a cane to help with her balance[]" but does not state the cane had been prescribed. (Tr. 177). Plaintiff's medical records from September 29, 1999 until August 13, 2003 (Tr. 210-21, 285-313) reveal that plaintiff requested a knee brace (Tr. 216), and was prescribed wrist splints (Tr. 288, 290), but make no mention of a prescribed cane.  Furthermore, as stated above, Dr. Khan, a non-examining physician, noted that plaintiff "uses [a] cane on her own." (Tr. 246).

[12]In 2001, plaintiff reported numbness in her left hand and arm (Tr. 216); however, she reported that condition was resolved on April 6, 2001. (Tr. 215). There are no other medical records that specifically address plaintiff's left upper extremity.

the portion of SSR 96-9p, which provides that "[a]ny <u>significant</u> manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base." SSR-96-9p at *8 (emphasis in original); (Dkt. #20, at 8). However, the ALJ considered plaintiff's carpal tunnel syndrome when determining what jobs she could perform and plaintiff has not explained how her wrist splints would significantly impair her ability to use her hands and fingers to a greater extent than the carpal tunnel syndrome itself.   Therefore, the ALJ did not err by not mentioning plaintiff's wrist splints.

### B. TREATING PHYSICIAN RULE

Plaintiff claims that the ALJ violated the treating physician rule by failing to accord controlling weight to the opinions of Drs. McReynolds and Vijay, plaintiff's treating physicians.  (Dkt. #17, Brief at 14-18).

The treating physician rule generally requires an ALJ to give "special evidentiary weight" to the medical opinion of a claimant's treating physician.  <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998).  However, the opinions of a treating physician are not afforded controlling weight when the opinions are inconsistent with other substantial evidence in the record, such as the opinions of other medical experts.   <u>See Veino v. Barnhart</u>, 312 F.3d 578, 588 (2d Cir. 2002)(treating physician's opinion is not controlling when contradicted by "other substantial evidence in the record"); 20 C.F.R. § 404.1527(c)(2)(formerly § 404.1527(d)(2)).   In determining the weight to be given the medical opinion of a treating physician, the ALJ must consider:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship;  (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors

28

> brought to the Social Security Administration's attention that tend to support or contradict the opinion.

20 C.F.R. § 404.1527(c). "The regulations also specify that the Commissioner will always give good reasons for [his] notice of determination or decision for the weight [he] give[s] [claimant's] treating source's opinion." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)(internal citations & quotations omitted). "The requirement for reason-giving exists, in part, to let claimants understand the disposition of their cases, even--and perhaps especially--when those dispositions are unfavorable." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999). A claimant is entitled to know the reasons why the Commissioner disagrees with the opinions of her physician concerning her disability. See id.

### 1. DR. McREYNOLDS

Plaintiff claims that the ALJ erred by not indicating that "Dr. McReynold[s]'[] opinion was evaluated and how he considered it[]" (Dkt. #17, Brief at 17), and by not assigning the opinions of Drs. McReynolds and Vijay "specific weight, but only sa[ying] that they are entitled to more weight than State Agency Consultants[.]" (Id.). However, the ALJ listed specific reasons why he disagreed with Dr. McReynolds' opinion concerning plaintiff's disability. (Tr. 32-33). He cited to the fact that in June 2001, plaintiff's arthralgia was not accompanied by obvious inflammatory process of the joints, that diagnostic imaging of her knees in July 2002 showed only mild joint space narrowing of both medial compartments and were found to be consistent with mild osteoarthritis, and that her knee impairments were treated conservatively with prescription medications rather than surgery. (Id.). The ALJ concluded that because of these inconsistencies, he did not afford Dr. McReynolds' opinion controlling weight but that he had "carefully considered" his opinion. (Tr. 33).

While a treating physician's opinion is normally entitled to controlling weight, the opinion will not be considered controlling if it conflicts with other substantial evidence in the record.  See Veino, 312 F.3d at 588.  As addressed above, the ALJ set forth a number of instances in which Dr. McReynolds' opinion was inconsistent with the record.  (Tr. 32-33).  In addition to the reasons specifically mentioned in the ALJ's decision, Dr. McReynolds' opinion was also inconsistent with x-rays taken in January 2002 which revealed normal feet and normal wrists (Tr. 298), a nerve conduction study performed in November 2001 which showed mild carpal tunnel syndrome only in plaintiff's right wrist and that her lower extremities were within normal limits (Tr. 261), and the fact that, beginning in April 2002, plaintiff was able to walk for forty-five minutes a day in order to help control her diabetes.  (Tr. 306).[13]  Also, on June 14, 2001, Dr. McReynolds claimed that due to torn knee ligaments in both knees as well as high blood pressure and diabetes, plaintiff would only be able to sit for a total of two hours, or one hour without interruption, throughout the course of an eight hour workday.  (Tr. 258).  However, despite plaintiff having been diagnosed with torn ligaments in both of her knees on January 1, 1999 (Tr. 166), an MRI on October 3, 1999 revealed that the ligaments in plaintiff's right knee were "intact."  (Tr. 224).  Therefore, the opinion of Dr. McReynolds was inconsistent with other substantial evidence and was not entitled to controlling weight.[14]

---

[13]Plaintiff takes issue with the reliance in defendant's brief on the reports of Dr. Raman and APRN Goss. (Dkt. #20, at 5-6).  However, as shown in this section, even without the reports from these two sources, Dr. McReynolds' opinion still substantially conflicts with other evidence in the record.

[14]Both parties have improperly stated aspects of Dr. McReynolds' assessment of plaintiff's RFC.  Defendant argues that Dr. McReynolds' "opinion was not . . . well-supported by  medically acceptable clinical and laboratory diagnostic techniques[]" because when asked to identify the

Despite finding that Dr. McReynolds' opinion was inconsistent with other evidence in the record, the ALJ was still required to adequately explain to plaintiff why the opinion was not given controlling weight.  See Snell, 177 F.3d at 133-34.  In his opinion, the ALJ cited to the fact that in June 2001, plaintiff's arthralgia was not accompanied by obvious inflammatory process of the joints, that diagnostic imaging of her knees in July 2002 showed only mild joint space narrowing of both medial compartments and were found to be consistent with mild osteoarthritis, and that her impairment was treated conservatively with prescription medications rather than surgery. (Tr. 32-33). Therefore, the ALJ provided good reasons to explain to plaintiff why the opinion of her treating physician was not being given controlling weight.

Finally, plaintiff claims that the ALJ erred by not specifying what level of weight he assigned to Dr. McReynolds' opinion.  (Dkt. #17, Brief at 17).  If an ALJ denies a plaintiff's claim, his decision must "be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion." Longbardi v. Astrue, No. 07 CV 5952(LAP), 2009 WL 50140, at *27 (S.D.N.Y. Jan. 7,

---

medical findings that supported his assessment, Dr. McReynolds wrote "none at this time." (Dkt. #19, Brief at 15). However, Dr. McReynolds only provided this answer when discussing the medical findings which support the section of the disability form concerning any environmental restrictions he assigned to plaintiff.  (Tr. 259).  He provided medical findings to support the sections of the form concerning his assessments of plaintiff's ability to lift and carry, sit, her postural limitations, and her physical functions; he supplied no medical findings to support the section of the form concerning his assessment of plaintiff's ability to stand/walk.  (Tr. 258-59). Despite defendant's misstatement, Dr. McReynolds' opinions are still inconsistent with other evidence in the record and this mistake does not alter the analysis.

Similarly, plaintiff incorrectly states that Dr. McReynolds' findings were made on June 14, 2007 and are therefore outside of the time range at issue in this decision.  (Dkt. #20, at 10). While the Court appreciates the difficulty of deciphering some of the handwriting in the transcript, a close examination of Dr. McReynolds' medical progress notes shows that he fairly consistently dated his notes in such a way that the year 2001 could be mistaken for the year 2007.  (See Tr. 210-16, 285-87).  The report at issue is actually from June 14, 2001 and is within the time frame at issue.

2009), quoting Disarno v. Astrue, No. 06 CV 0461(JTC), 2008 WL 1995123, at *4 (W.D.N.Y. May 6, 2008))(internal quotations omitted).  In his decision, the ALJ stated that he would not accord controlling weight to Dr. McReynolds' opinion but that "Dr. McReynolds' observations and findings are not ignored and have been carefully considered in providing insight as to functional ability and how they affect the claimant's ability to work." (Tr. 33).  He also stated that he accorded substantial weight to the opinions of the State's non-examining medical physicians because "their opinions are not inconsistent with the medical evidence as a whole[.]" (Id.).  Therefore, while the ALJ's description of the weight he gave to Dr. McReynolds' opinion is not precise, this Court can determine that it was given a degree of weight that was less than controlling and less than substantial.[15]

### 2. DR. VIJAY

Similarly, on July 1, 2003, Dr. Vijay prepared a one-paragraph letter, in which he indicated that plaintiff was "commencing her medical care under my doctorship [sic] today.  From this day on, she will be under my care for her[] medical issues.  And still unable to work." (Tr. 302).  The only medical records in the file by Dr. Vijay, for the period July 1, 2003 through October 10, 2003 were the two-page notes for July 1, 2003 (Tr. 295-96), which give no indication whatsoever regarding any disabling condition plaintiff might have.  Under these circumstances, Dr. Vijay's July 1, 2003 letter is not

---

[15]Plaintiff briefly mentions that on March 22, 2001, Dr. McReynolds wrote a note stating that "[plaintiff] has been seen and examined by me. Due to certain physical conditions will be unable to participate in the course she is currently enrolled in at this time." (Dkt. #17, Brief at 17, quoting Tr. 257).  However, neither plaintiff's brief nor the record clarifies the type of course Dr. Reynolds' note is referencing.  Without any further information, this note reveals nothing about plaintiff's level of impairment, and the ALJ did not err by not mentioning it in his decision.

entitled to any controlling weight as a report of a treating physician. See also Brault, 683 F.3d at 448.

### C. ALJ'S EVALUATION OF AILMENTS SINGLY AND IN COMBINATION

Plaintiff claims that the ALJ erred by not considering all of her symptoms, including carpal tunnel syndrome and depression. (Dkt. #17, Brief at 18-21). She contends that the ALJ did not address these conditions to determine whether or not they were severe, to describe their disabling effects, or to discuss any symptoms or limitations that they cause. (Id.).

First, plaintiff argues that the ALJ "made no mention" of plaintiff's depression and carpal tunnel syndrome and "did not address them for the purpose of determining whether they are severe or non-severe." (Id. at 18). However, a brief examination of the ALJ's decision shows that this contention is not true. The ALJ found plaintiff's depression to be a severe impairment and her carpal tunnel syndrome to be a medically determinable impairment that was not severe. (Tr. 28). Therefore, plaintiff's claims that the ALJ did not "mention" or "address [plaintiff's depression and carpal tunnel syndrome] for the purpose of determining whether they are severe" are incorrect. (Dkt. #17, Brief at 18).[16]

Second, plaintiff claims that her carpal tunnel syndrome should have been considered severe. (Dkt. #17, Brief at 18-19). However, because plaintiff's nerve conduction study showed only "a mild, right median nerve demyelinating neuropathy across the wrist/i.e. carpal tunnel syndrome[,]" (Tr. 261), and only in plaintiff's right wrist,

---

[16]Plaintiff's brief even contradicts itself when claiming that the ALJ's decision "made no mention of" plaintiff's depression and "did not address [it] to determine whether [it] was severe." (Dkt. #17, Brief at 18). In the previous sentence, the brief points out  that "The ALJ said that [plaintiff] has three severe impairments: Depression . . . ." (Id.)(emphasis added)(citations omitted).

the ALJ did not err by determining that plaintiff suffered from carpal tunnel syndrome but not finding it to be a severe impairment.  Also, once a "severe" impairment has been found, the ALJ must base his RFC on all the relevant medical evidence, including both "severe" and "non-severe" impairments.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The Regulations state that "[w]e will consider all of your impairments of which we are aware, including your medically determinable impairments that are not 'severe' . . . when we assess your [RFC]."  20 C.F.R. § 404.1545(a)(2). Therefore, because the ALJ found that plaintiff had at least one severe impairment, it is not important whether or not he listed all of her other impairments severe at this stage in his analysis. See Jones-Reid v. Astrue, 934 F. Supp. 2d 381, 402 (D. Conn. 2012)(as other circuit courts have already decided, the Court found that "[a]t step two, if the ALJ finds an impairment is severe, 'the question whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.'")(citation omitted), aff'd, 515 F. App'x 32 (2d Cir. 2013)).

Plaintiff also claims that the ALJ did not evaluate the symptoms and pain that resulted from her depression and carpal tunnel syndrome.  (Dkt. #17, Brief at 18-21; Dkt. #20, at 10-11).  When examining plaintiff's mental conditions, including her severe impairment of depression, the ALJ explained and followed the step-by-step analysis set forth in 20 C.F.R. §§ 404.1529(c) and 416.929(c) to evaluate a claimant's symptoms, including pain. (Tr. 30-32).  The ALJ ultimately concluded that while plaintiff suffered from severe impairments, her "statements concerning her impairment and their impact on [her] ability to work are considerably more limited and restricted than is established by the medical evidence."  (Tr. 31).  In order to account for plaintiff's mental health issues, the ALJ also included restrictions in her RFC so that plaintiff could "only perform cognitive

34

simple, routine, and repetitious work with one or two step instructions" and was "limited to a supervised, low stress environment defined as one requiring few decisions." (Tr. 30). The ALJ also discussed plaintiff's carpal tunnel syndrome and found it to be a medically determinable impairment that was not severe.   (Tr. 28).   He discussed hypothetical questions posed to the VE which would have prevented plaintiff from engaging in jobs which required repetitive tasks but noted that "medical records from treating sources in January 2002 found no evidence of any abnormalities of the wrists[.]"  (Tr. 34; see also Tr. 298).   He also noted that while plaintiff was not "pain-free[,]" some of plaintiff's described restrictions were self-imposed and not supported by the medical evidence.  (Tr. 31). Therefore, contrary to plaintiff's assertions, the ALJ did consider plaintiff's carpal tunnel syndrome, and depression, and their disabling effects, including pain, when making his determination.

Finally, plaintiff argues that the ALJ erred by failing to consider the combination of her impairments.  (Dkt. #17, Brief at 20-21).   However, the ALJ's decision repeatedly referred to the fact that he was required to consider plaintiff's impairments singly and in combination (Tr. 26, 27, 28, 29), including both severe and non-severe impairments. (Tr. 27). His decision specifically stated that plaintiff's impairments, singly or in combination, did not meet any listing.  (Tr. 29).   Therefore, the ALJ did not fail to consider the combination of plaintiff's impairments.  See Lena v. Astrue, No. 3:10 CV 893(SRU), 2012 WL 171305, at *12 (D. Conn. Jan. 20, 2012)("[T]he ALJ repeatedly described the requirement that he consider [plaintiff's] impairments singly and in combination. He specifically found that [her] impairments did not meet a listing either singly or in

combination. The ALJ's decision indicates that he considered all of the impairments in evaluating [plaintiff's] RFC.").

D.  LISTING 1.02A

Plaintiff argues that she qualified for disability between 1999 and 2003 by meeting Listing 1.02A for a major dysfunction of a joint and that the ALJ erred by not analyzing her claim under this listing. (Dkt. #17, Brief at 21-22; see also Dkt. #20, at 2).  Plaintiff claims that she met Listing 1.02A due to her knee injuries, her use of a cane, and her inability to use public transportation.  (Id.).

In order to meet Listing 1.02A, a claimant must demonstrate, "[i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively[.]" 20 C.F.R. Part 404, Subpt. P, App'x 1 § 1.02(A). The inability to ambulate effectively "means an extreme limitation of the ability to walk . . . . Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."  Id. at 1.00(B)(2)(b)(1).

> [E]xamples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with use of a single hand rail.

Id. at 1.00(B)(2)(b)(2).  Plaintiff contends that she used one cane, not two, and there is no evidence that it limited the functioning of both of her upper extremities.  (See Tr. 177, 188).  Also, in 2001, plaintiff was able to exercise by walking for forty-five minutes every day (Tr. 306) and Dr. McReynolds found that plaintiff had "zero gait disturbance[.]" (Tr.

216).   Therefore, substantial evidence exists to show that plaintiff did not have an extreme limitation in her ability to walk.

Finally, plaintiff claims that she met Listing 1.02A because "[s]he could not use public transportation due to problems in her bones and knees." (Dkt. #20, at 2; see also Dkt. #17, Brief at 22).[17]  Plaintiff's statement is incorrect.  The document to which plaintiff cites states that plaintiff is "[a]fraid to take public transportation . . . since her attacks" (Tr. 171) and this fear was noted while analyzing plaintiff's stress tolerance, not her physical ailments.   (Id.).[18]   There is no evidence that this fear of using public transportation is related to problems that plaintiff has with her bones or knees.  Therefore, the ALJ did not err by not analyzing plaintiff's claim under Listing 1.02A.

E.  PLAINTIFF'S RFC

Plaintiff claims that the ALJ failed to properly determine her RFC because: the ALJ's RFC conflicts with the opinions of her treating physicians; the RFC does not match either RFC given by the DDS physicians; the ALJ failed to explain the contradiction between the opinions of the treating physicians and his RFC; the State DDS physicians did not have a complete medical record when they assessed plaintiff's RFC; and the ALJ failed to include plaintiff's use of a cane and wrist braces in his RFC. (Dkt. #17, Brief at 23-24).

--------

[17]Plaintiff's brief originally states that "[s]he could use public transportation due to problems in her bones and knees." (Dkt. #17, Brief at 22)(emphasis added).  However, plaintiff's reply brief states that plaintiff "could not use public transportation due to problems in her bones and knees." (Dkt. #20, at 2)(emphasis added).  Examining these conflicting statements in the context of plaintiff's arguments, the Court will assume that plaintiff is claiming that she was not able to use public transportation.

[18]Plaintiff seems to be aware of the fact that her inability to use public transportation is not a result of "problems in her bones and knees[]" (compare Dkt. #17, Brief at 22 with id. at 19) since earlier in her brief, while citing to the same supporting document, she lists an inability to use public transportation as a limitation caused by her depression.  (Id. at 19).

An individual's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999), quoting SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). When making the RFC determination, an ALJ must consider "a claimant's physical abilities, mental abilities, symptomology, including pain, and other limitations which could interfere with work activities on a regular and continuing basis." Pardee v. Astrue, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009), citing 20 C.F.R. § 1545(a).

Plaintiff asserts that the ALJ erred by assigning an RFC that was not consistent with the opinions of her treating physicians, that the RFC does not match either RFC given by the DDS physicians, and that the ALJ failed to explain the contradiction between the treating physician's records and his RFC.  (Dkt. #17, Brief at 23).  When determining plaintiff's physical RFC, the ALJ explicitly stated that in June 2001 the claimant had arthragias but without obvious inflammatory process of the joints, diagnostic imaging in 2001 showed only mild joint space narrowing of both medial compartments and were found to be consistent with mild osteoarthritis, and her impairment was treated conservatively with medication instead of surgery.  (Tr. 32-33). The ALJ explained that while he was not according Dr. McReynolds' opinion that plaintiff could not even perform sedentary level work controlling weight, he had considered it when determining plaintiff's ability to work.  (Tr. 33).  The ALJ also accorded substantial weight to the opinions of the non-examining physicians who determined that plaintiff was capable of performing light level work.  (Id.).  The ALJ considered all of these opinions and facts before ultimately determining that restrictions to "sedentary levels of work  adequately safeguard the claimant from strenuous physical activity that might exacerbate her symptoms."  (Id.).

38

Although the ALJ did not adopt the exact RFC that was suggested by either the treating source or the non-examining physicians, his RFC was based upon substantial evidence in the record and the ALJ explained why he chose to not adopt the RFC of the treating physician.  Therefore, the ALJ did not err when assigning plaintiff's RFC.

Plaintiff also claims that the ALJ erred by relying on an assessment of plaintiff's RFC that was made without the complete record for review.  (Dkt. #17, Brief at 23-24). Plaintiff argues that the DDS physicians "had a grossly incomplete portion of [plaintiff's] records[;]" however, the only report that plaintiff states was missing was the Consultative Psychological Examination performed by Dr. Volle on September 14, 2001.  (Id. at 24). Plaintiff cites to Payne v. Astrue, No. 3:10 CV 01565(JCH), 2011 WL 2471288 (D. Conn. June 21, 2011), to support her assertion that "[i]f the non-examining doctor has not reviewed all of a claimant's pertinent medical records, the opinion of the non-examining doctor is entitled to almost no weight, or to no weight at all." (Dkt. #17, Brief at 23-24). In Payne, (now Chief) U.S. District Judge Janet C. Hall found that the ALJ erred when he relied upon the reports of two non-examining doctors to make his determination about plaintiff's physical limitations when the non-examining doctors did not have access to all of plaintiff's medical records, including MRI, electromyography, and radiology reports. Payne, 2011 WL 2471288, at *7-8. In this case, unlike in Payne, the record to which plaintiff claims the non-examining doctors did not have access was a psychological exam. (Tr. 188-91).  While Dr. Volle's opinion includes some information about plaintiff's physical limitations, he clarifies that he was not provided with reports from plaintiff's physicians, therefore "her reports of medical history constitute allegations only."  (Tr. 189).  Dr. Volle tested and diagnosed plaintiff's mental limitations (Tr. 190-91), while the DDS examiners

reviewed only plaintiff's physical restrictions. (Tr. 179-87, 245-53).  Also, Dr. Khan did have access to Dr. Volle's report when he performed his RFC assessment on December 21, 2001.  (Tr. 252).

Plaintiff does not specify any other records that Drs. Waldman and Khan were lacking when making their determination; however, in the interest of thoroughness, the Court will address the plaintiff's medical records that post-date the reports of these two doctors.  Shortly after Drs. Waldman and Khan completed their reports, plaintiff underwent cataract surgery which successfully improved her vision.  (Tr. 263-78). For the next two years, plaintiff's progress notes show that she continued to experience pain in her hands, feet, and knees.  (Tr. 285-96, 303-13).  Plaintiff had x-rays on January 22, 2002 to investigate the source of her pain and the results revealed normal feet and wrists. (Tr. 298).   Plaintiff underwent a heart stress test which showed normal results on August 27, 2003 (Tr. 325), and on September 11, 2003, plaintiff underwent a breast biopsy which revealed no evidence of a malignant growth.  (Tr. 334; see also Tr. 335, 332-33, 386-88, 391-92, 394-95, 402).   The only report upon which these non-examining physicians relied that conflicts with the remainder of the relevant record is an x-ray from May 25, 2000 which showed normal knees (Tr. 222), while on July 18, 2002, x-rays of plaintiff's knees showed mild joint space narrowing that was consistent with osteoarthritis. (Tr. 279).

Under Shinseki v. Sanders, 556 U.S. 396, 410 (2009) a claimant has the burden of showing that an error committed by the ALJ was harmful.  While the burden on claimant to show that an error was harmful is not onerous, plaintiff has failed to demonstrate how the RFC determined by the DDS physicians would have been altered if they had been

provided with Dr. Volle's Initial Level Consultative Psychological Examination and the remainder of the record.   While x-ray tests showed that plaintiff developed mild osteoarthritis in her knees after the non-examining doctors had submitted their reports, the ALJ took this into consideration by finding plaintiff's osteoarthritis, or degenerative joint disease, to be a severe impairment.  (Tr. 28).  He also assigned plaintiff a sedentary work level with restrictions to "adequately safeguard the claimant from strenuous physical activity that might exacerbate her symptoms[]" (Tr. 33), rather than adopting the light work level suggested by Drs. Waldman and Khan.  (Tr. 187, 253).  Therefore, there was no harm caused by the ALJ relying on these opinions.[19]

Finally, plaintiff claims that the opinion of the two non-examining agency physicians cannot be given the substantial weight needed to override the opinion of plaintiff's treating physician.  (Dkt. #20, at 2-3, 4-5, 9).  However, the regulations "permit the opinions of nonexamining sources to override treating sources' opinions, provided that they are supported by evidence in the record." Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993), citing 20 C.F.R. §§ 404.1527(f), 416.927(f). In this case, the treating physician's opinion was inconsistent with the record (see Section IV.B. supra) and the opinions of the non-examining sources were supported by evidence in the record that showed that plaintiff suffered from only mild carpal tunnel syndrome in her right wrist (Tr. 261), nerve conduction within normal limits in her lower extremities (id.), normal feet and wrists with no bone abnormalities or soft tissue abnormalities (Tr. 298), mild osteoarthritis in her knees (Tr. 279), and that she was able to exercise by walking for forty-five minutes

---

[19]Plaintiff also argues that the ALJ erred by failing to include plaintiff's use of a cane and wrist braces in his RFC. However, the Court has already addressed this issue at Section IV.A. supra.

each day. (Tr. 306). Therefore, because the treating physician's opinion was inconsistent with the record and the opinions of the non-examining sources were supported by evidence in the record, the ALJ did not err by affording these opinions substantial weight over the opinion of the treating physician when determining plaintiff's RFC.

### F. PLAINTIFF'S ABILITY TO PERFORM OTHER JOBS

Plaintiff argues that the ALJ erred when determining that work existed in significant numbers that plaintiff could perform because: his RFC assessment was flawed and an accurate RFC assessment would eliminate any such jobs; the VE failed to provide Dictionary of Occupational Titles ["DOT"] numbers for the positions he discussed in his testimony; and the jobs listed by the VE were inconsistent with the mental limitations included in the ALJ's RFC. (Dkt. #17, Brief at 24-27).

The ALJ has an affirmative duty to ask whether a VE's testimony is consistent with the DOT and to resolve any conflicts that arise. SSR 00-4p, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000). However, "[t]here is no requirement that the VE testify as to which DOT codes []he relied upon." Ryan v. Astrue, 650 F. Supp. 2d 207, 218 (N.D.N.Y. 2009).

Plaintiff's first argument is that the ALJ's RFC assessment was flawed and that an accurate RFC would have led to a finding that plaintiff was unable to perform any work during the relevant time period. (Dkt. #17, Brief at 24-25). As has been discussed, see Section IV.E. supra, the ALJ did not err when determining plaintiff's RFC; therefore, his step five analysis was based on a correct RFC.

Plaintiff next argues that the VE's testimony was incomplete because he failed to provide DOT codes for the positions he discussed and that without these codes it would be impossible to know whether plaintiff could perform the listed positions. (Dkt. #17, Brief

at 25-26).  During plaintiff's hearing, the VE testified that an individual with plaintiff's age, education, and past relevant work experience, who is limited to performing sedentary work, is limited to simple, routine, and repetitive work with one or two step instructions and requires a supervised position requiring few decisions, would be able to work as an assembler, a sedentary level general production laborer, or an inspector. (Tr. 61-62). After being asked by the ALJ, the VE confirmed that his testimony was consistent with the DOT except for the fact that he classified plaintiff's previous work as an electronics assembler, as she performed it, as sedentary level work when the DOT classifies an electronics assembler position as light work. (Tr. 60-62). The ALJ continued to question the VE on this point and was told that while the DOT defines an electronics assembler position as light level work, many electronics assemblers, plaintiff included, actually perform at the sedentary level.  (Tr. 60-61).  Therefore, the ALJ fulfilled his duty to ask whether the VE's testimony was consistent with the DOT and to resolve any conflict that was mentioned.

Plaintiff is correct that during the hearing, the VE did not provide, and neither the ALJ nor plaintiff's counsel asked for, the DOT codes for the positions he listed. However, the VE is not required to state these codes.  See Ryan, 650 F. Supp. 2d at 218.  Also, because of the VE's expertise, the ALJ was allowed to rely upon his opinion to support his finding that plaintiff could perform work that exists in significant numbers in the national economy. See Rivera v. Colvin, No. 11 CIV 7469 (LTS)(DF), 2014 WL 3732317, at *42 (S.D.N.Y. July 28, 2014)("Given Dr. Pearsall's expertise as a vocational expert, the ALJ was entitled to rely on that testimony to support his finding that [p]laintiff could perform the job of a housekeeper[,]" citing Pena v. Astrue, No. CV 11099(GWG), 2008 WL

43

5111317, at *10 (S.D.N.Y. Dec. 3, 2008)).   Therefore, the VE's testimony was not incomplete and the ALJ did not err by relying on it.

Plaintiff also argues that the ALJ's decision should be remanded because the VE testified that plaintiff could work as an assembler but had also "previously testified that [plaintiff's] prior relevant work includes that of an assembler, and that she would be <u>unable</u> to perform this job." (Dkt. #17, Brief at 26)(emphasis in original)(internal citation omitted). However, a careful reading of the VE's testimony clearly shows that the VE distinguished between plaintiff's previous work as an electronics assembler and the assembler position described in response to the ALJ's hypothetical.  (Tr. 60-62).  The VE claimed that plaintiff would be unable to perform her past work as an electronics assembler because its semi-skilled nature would conflict with plaintiff's mental RFC (Tr. 61-62), but he made no mention of a similar issue with a position as an assembler.  (<u>Id.</u> at 62).  Also, the VE corrected himself when he began to refer to plaintiff's past work as an assembler and clarified that he was referring to the position of an electronics assembler.  (<u>Id.</u> at 60)("but again many times assemblers, electronic assemblers can be performed at the sedentary level . . . but the DOT is light . . ."). Therefore, the VE's testimony did not contradict itself in such a way to require a remand for further explanation.

Finally, plaintiff contends that the ALJ erred because the mental limitations in the RFC limit her to "perform cognitive simple, routine and repetitive work with one or two step instructions and . . . a supervised, low stress environment defined as one requiring few decisions" (Tr. 30), and that such a restriction is only consistent with Reasoning Level One jobs while the sedentary positions listed by the VE all require a higher Reasoning

Level. (Dkt. #17, Brief at 26-27).   However, a restriction of simple tasks or instructions is consistent with both Reasoning Level Two and Three positions. Jones-Reid, 934 F. Supp. 2d at 408.   Plaintiff's RFC restriction to "cognitive simple, routine and repetitious work with one or two step instructions" (Tr. 30) is consistent with the RFC in Jones-Reid restricting a claimant to "short, simple instructions." 934 F. Supp. 2d at 408. Plaintiff's further restriction to "a supervised, low stress environment defined as one requiring few decisions" (Tr. 30) also does not conflict with a Reasoning Level 2 job which would require her to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions." Appendix C, Dictionary of Occupational Titles (4th ed., Rev. 1991).[20] Therefore, plaintiff's mental limitations did not conflict with the reasoning levels of the positions listed by the VE.

G. THE APPEAL'S COUNCIL REMAND ORDER

Plaintiff's final claim is that the ALJ failed to follow the four instructions in the remand order from the Appeals Council. (Dkt. #17, Brief at 27-28).

First, plaintiff contends that the ALJ failed to give consideration to the treating source opinions because he did not assign them a specific weight and did not consider them when formulating an RFC. (Id. at 27). As discussed in Section IV.B.2. supra, Dr. Vijay's conclusion that plaintiff was "still unable to work" (Tr. 302) was not entitled to any special significance.   See 20 C.F.R. § 404.1527(c).   Also, as discussed in Section IV.B.1. supra, the ALJ considered and gave a satisfactory explanation as to the weight he assigned Dr. McReynolds' opinion.   Therefore, the ALJ properly followed the order of the

---

[20]This level of reasoning ability is also consistent with the opinion of Dr. Volle, who, after a consultative psychological examination, determined that plaintiff had a "satisfactory ability to understand, carry out, and remember instructions, and a satisfactory ability to respond appropriately to supervision, coworkers, and work pressures in a work setting."  (Tr. 191).

Appeals Council to give consideration and explain the weight given to the treating source opinions.  (Tr. 415).

Plaintiff next claims that the ALJ erred by not following the order of the Appeal's Council to further evaluate plaintiff's mental impairments.  (Dkt. #17, Brief at 27).  While plaintiff acknowledges that the ALJ did discuss her mental conditions, she claims that his discussion was "superficial[.]"  (Id.).  The ALJ analyzed plaintiff's mental conditions to see if she met the requirements of Listing 12.04 for Affective Disorders.  (Tr. at 28-29).  He followed the order of the Appeal's Council by considering the 20 C.F.R. §§ 404.1520a(c) and 416.920a(c) criteria of her activities of daily living, her social functioning, her ability to sustain focused attention sufficiently long enough to permit timely completion of tasks commonly found in the work setting, and her lack of episodes of deterioration or decompensation in work or work-like settings.  (Id.).  He also acknowledged that plaintiff suffered from an affective disorder that, while severe, was not disabling and included limitations caused by this affective disorder in his RFC.  (Tr. 29, 30).  Therefore, the ALJ followed the Appeals Council's order to further evaluate plaintiff's mental impairment.

Plaintiff claims that the ALJ did not follow the Appeals Council's order to "give further consideration to plaintiff's maximum [RFC] and provide appropriate rationale with specific references to evidence of record" (Tr. 415) because the ALJ's RFC was "not based on anything else in the record" and because it did not take into account the opinions of plaintiff's treating physicians or her use of a cane and wrist braces.  (Dkt. #17, Brief at 28).  However, the ALJ's RFC assessment included new limitations that plaintiff was limited to only "perform cognitive simple, routine, and repetitious work with one or two step instructions and is limited to a supervised, low stress environment defined as one

requiring few decisions." (<u>Compare</u> Tr. 30 <u>with</u> Tr. 409).   He also explained the rationale for this addition and cited to objective medical evidence from APRN Goss, Dr. Volle, and two State agency non-examining medical experts.   (Tr. 31-32).   The ALJ also discussed and considered the opinion of Dr. McReynolds (Tr. 32-33; <u>see also</u> Section IV.B.1. <u>supra</u>), and was not required to specifically discuss plaintiff's use of a cane or wrist braces when they did not significantly erode the occupational base (<u>see</u> Section IV.A. <u>supra</u>).   Therefore, the ALJ followed the Appeals Council's order to further consider plaintiff's RFC.

Finally, plaintiff argues that the ALJ failed to follow the Appeals Council's order to obtain the testimony of a VE. (Dkt. #17, Brief at 28).   While plaintiff admits that the ALJ did obtain this testimony, she claims it was flawed to such an extent that it was "unclear and completely unusable."   (<u>Id.</u>).   However, the ALJ obtained the testimony of a VE and, as has already been discussed, <u>see</u> Section IV.F. <u>supra</u>, the testimony was appropriately specific and not contradictory. Therefore, the ALJ followed the order of the Appeals Council to obtain the testimony of a VE.

## V. CONCLUSION

For the reasons stated above, plaintiff's Motion for Order Reversing the Decision of the Commissioner or in the Alternative Motion for Remand for a Hearing (Dkt. #17) is **denied**; and defendant's Motion for Order Affirming the Decision of the Commissioner (Dkt. #19) is **granted**.

The parties are free to seek the district judge's review of this recommended ruling. <u>See</u> 28 U.S.C. §636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; F<small>ED</small>. R. C<small>IV</small>. P. 6(a), 6(e), & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the

District of Connecticut; <u>Small v. Secretary of HHS</u>, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).**

Dated this 24th day of October, 2014 at New Haven, Connecticut.


/s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge